# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL MYERS, JR., | : | CIVIL NO: 4:16-cv-00527 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Brann) |
| v. | : | |
| | : | (Chief Magistrate Judge Schwab) |
| NANCY A. BERRYHILL,[1] | : | |
| *Commissioner of the* | : | |
| *Social Security Administration* | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g) of the Social Security Act, the plaintiff, Paul Myers, Jr. ("Myers"), seeks judicial review of a decision denying him Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The defendant is Berryhill, the Acting Commissioner of the Social Security Administration ("Commissioner"). For the reasons set forth below, we recommend that the Commissioner's final decision denying Myers's application

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Acting Commissioner of Social Security, Nancy A. Berryhill ("Berryhill"), is automatically substituted for Carolyn W. Colvin, the former Commissioner of Social Security. *See* FED. R. CIV. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.")

for DIB be vacated and the case be remanded for further proceedings consistent with this Report and Recommendation.

## I. Procedural Background.

Myers protectively filed an application for DIB with the Social Security Administration on January 8, 2013, alleging a disability onset date of November 8, 2012 (*doc. 1* at ¶ 5; *doc. 7* at ¶ 3),[2] due to a combination of lumbosacral degenerative disease, diffuse osteoarthritis, major depression (recurrent), and panic disorder with agoraphobia (*see doc. 8-2* at 16). His application was initially denied by the Social Security Administration on April 8, 2013. *Doc. 1* at ¶ 6; *doc. 7* at ¶ 3.

On May 15, 2013, Myers filed a request for a hearing before an Administrative Law Judge ("ALJ"). *Doc. 1* at ¶ 7; *doc. 7* at ¶ 3. On October 9, 2014, Myers appeared and testified at a hearing before an ALJ. *Doc. 1* at ¶ 7; *doc. 7* at ¶ 3; *see also doc. 8-2* at 31-57. An impartial vocational expert ("VE") also appeared and testified at the hearing. *Id.* at 31. On October 16, 2014, the ALJ denied Myers's application for DIB and found that Myers was not disabled within the meaning of the Social Security Act. *Doc. 1* at ¶ 8; *doc. 7* at ¶ 3.

_____

[2] During the hearing, the ALJ asked Myers's counsel whether "there's going to be an amended onset date [of] March 7th, 2014[.]" *Doc. 8-2* at 33. Although Myers's counsel responded "Yes," that there would be an amended onset date, both parties explicitly agree that the alleged onset date is November 8, 2012. *Doc. 1* at ¶ 5; *doc. 7* at ¶ 3.

On December 5, 2014, Myers filed a request for review of the ALJ's decision. *Doc. 8-2* at 8; *see also doc. 1* at ¶ 9; *doc. 7* at ¶ 3. The Social Security Appeals Council denied Myers's request for review on February 8, 2016, thereby rendering the ALJ's decision the final decision of the Commissioner with respect to Myers's application for DIB. *Doc. 1* at ¶ 9; *doc. 7* at ¶ 3.

On March 28, 2016, Myers filed a counseled complaint in this Court, appealing[3] the Commissioner's final decision denying him DIB. *Doc. 1*. The Commissioner answered the complaint on June 9, 2016. *Doc. 7*. On September 2, 2016, Myers filed a brief in support of his complaint (*doc. 14*), to which the Commissioner filed a brief in opposition on October 4, 2016 (*doc. 16*). Myers has since filed a reply brief. *Doc. 17*.

Thus, the instant appeal, which has been briefed by both parties, is ripe for our disposition. After a thorough review of the record, we conclude that the ALJ's decision denying Myers's application for DIB should be vacated and the case should be remanded for further proceedings consistent with this Report and Recommendation.

---

[3] Under the Local Rules of this Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits shall be adjudicated as an appeal[.]" M.D. Pa. L.R. 83.40.1.

## II. Factual Background.

Myers was born on September 7, 1959, and was 53 years old on his alleged onset date of disability, 54 years old on the date last insured, and 55 years old on the date of his hearing. *See doc. 8-2* at 22, 33. Thus, Myers, at all times relevant to this matter, was considered a person "approaching advanced age." 20 C.F.R. 404.1563(d) ("If you are closely approaching advanced age (age 50–54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work."). He lives with his wife, daughter, and granddaughter. *Doc. 8-7* at 54; *see also doc. 8-2* at 33-34. He has a high school education, but has not completed any type of specialized job training, trade, or vocational school. *Doc. 8-2* at 33-34. His past relevant work includes time spent as tractor-trailer driver and brick mason. *Id.* at 22.

### A. The Administrative Hearing on October 9, 2014.

#### 1. Myers's Testimony.

Regarding his past employment, Myers testified that he used to work as a brick mason and commercial truck driver. *See id.* at 47, 50. He also testified, however, that he had to give up his CDLs and stop working as a commercial truck driver, partially because it required him to give up his medications, leading to an increase in his anxiety and panic attacks. *See id.* at 47.

Regarding his day-to-day activities, Myers testified that a typical day for him is watching television or reading the newspaper, along with completing household chores and maintenance work at home, including cooking, cleaning, taking out the trash, and doing yard work. *Id.* at 35-36. He also testified, however, that he rarely drives, unless it is for his doctors' appointments (*id.* at 35) and that he rarely sees his friends or family, unless they come to his house for a visit (*id.* at 36). Myers testified that his wife works two jobs to support the family and that they do not get out much. *Id.* at 36. Myers testified that he previously enjoyed the outdoors, including hunting and fishing, but that he has not hunted in the past 10 years or fished in the past 5 years. *Id.* at 36-37.

Regarding his physical impairments, Myers testified that he has trouble holding small objects because he can no longer grasp things in his hand. *Id.* at 37. He explained that his hands begin to swell up and hurt if he does any yard work or if he holds anything with a grip. *Id.* at 48. He further explained that although he previously had surgery on his hands, his surgeon told him that the pain would probably return. *Id.* Myers also testified, however, that he is able to climb stairs and an eight feet ladder to clean leaves from the spout on the back porch of his house. *Id.* at 38. But, he explained, if he attempts to go any higher than that, he tries to call a neighbor. *Id.*

In addition to the pain he experiences in his hands, Myers's testimony appears to suggest that his hip will cause him pain if he walks two blocks and that he can only stand in one spot for about an hour before his hip and back begin to hurt. *See id.* at 38-39. He also testified that he can only sit comfortably for about an hour to two hours and that lying down is generally more comfortable. *See id.* at 49.

Although Myers has pain in his hands, hips, and back, Myers explained that he has not been treated by any doctors for such pain because he has no health insurance. *Id.* at 48. In support, Myers stated that he and his wife cannot afford to incur medical bills because they are living off of his wife's income. *Id.* Along those same lines, Myers testified that although Dr. De La Cruz wanted to hospitalize him a few times for his depression, he opted to "crawl under the covers at home and ride it out[,]" rather than incurring thousands in medical bills. *Id.*

Regarding his mental impairments, Myers testified that 2014 was a particularly tough year for him because he "went downhill in a hole, a terrible, terrible well of deep, deep depressions." *Id.* 39-40. Myers also testified that Dr. De La Cruz took him off a medication and put him on Paxil, after which he went "deeper and deeper and deeper" into a state of depression. *Id.* at 40. Myers explained that when he is in the middle of these deep depressions, he does not want to be alive. *Id.* Myers testified that it took him six months from this low point to

get to a state of "melancholy." *Id.* In addition to his Paxil prescription, Myers testified that he also takes a total of 5 milligrams of Xanax throughout the day. *Id.* at 41. Myers explained that he experiences a little bit of drowsiness for about an hour after taking Xanax and that he has noticed more vivid dreams after taking Paxil. *Id.* at 40-41. He also stated, however, that he believes his body is building a tolerance to Xanax so he is working with his therapist, Jeffrey Schlegel ("Schlegel"), to stop taking it and to begin working on coping skills as a substitute. *Id.* at 41. Myers stated that he has gone to Schlegel for therapy for about thirty, one-hour sessions over the past two years. *Id.* He stated that sometimes he sees Schlegel biweekly or monthly, depending on Schlegel's schedule. *Id.* at 41-42.

In addition to his coping skills, Myers testified that he tries to keep himself busy at home in order to break the pattern of falling into deep depressions. *Id.* at 42. When he falls into these deep depressions, Myers explained that he is unable to complete household chores and other tasks because "he crawls under the covers and hang[s] on until it eases." *Id.* at 42-43. He also explained that he never has "ups" with his "downs" (*id.* at 45) and that, even during his "melancholy stage," he has trouble performing his household chores because he is less motivated (*id.* at 43).

On top of struggling with depression, Myers testified that "[j]ust about everything" brings on his anxiety and panic attacks, including being in public and

ringing telephones.[4]  *Id.* at 43-44.   Myers explained that his anxiety completely interrupts his sleep, such that he is unable to sleep more than about two hours at a time.  *Id.* at 45.  When his anxiety wakes him, he testified that he goes downstairs, tries to focus, and, in an effort to relax, uses his coping skills to slow down his breathing and heart rate.  *Id.*  Myers stated that there are some nights where he will not get any sleep because his anxiety is so heightened.  *Id.* at 46.  As a result of not sleeping at night, Myers testified that he will try to sleep during the day for about an hour, but that this sleep is also interrupted by his anxiety.   *Id.*

Additionally, Myers testified that his anxiety affects his ability to focus and concentrate and that he often finds himself "spacing" and "not focusing" when watching television or working on projects at home.  *Id.*  He also testified that he is unable to go out in public because his anxiety is heightened, thereby ensuing his panic attacks.  *Id.* at 46-47.  Myers recounted that, in an attempt to work on his anxiety, he used to practice driving around, but that he no longer does this.  *Id.* at 51-52.  He stated that if he ever does get out of the house, he is usually looking for doors in case he needs to leave.  *Id.* at 52.  For that reason, Myers explained, he has missed many family functions, including funerals, holidays, and birthdays.  *Id.*

---

[4]  Myers conceptualizes his days as a constant battle between anxiety and depression. When his depression takes over, he is "done;" he is "mush."  *Id.* at 43-44.

## 2. VE's Testimony.

At the administrative hearing on October 9, 2014, an impartial VE also testified. *See id.* at 53. Initially, the VE explained that Myers's jobs in the last 15 years included employment as a tractor-trailer truck driver, which is classified and performed as "medium," and as a brick mason, which is also classified as medium, but performed as "very heavy." *Id.* Then, the VE responded to a series of hypotheticals posed by the ALJ. *Id.* at 53-56.

First, the ALJ asked the VE whether a hypothetical individual of the same age, education, and past work history as Myers, who cannot drive commercially, who engages in work that is limited to simple, routine, repetitive tasks involving only simple work-related decisions, with few if any workplace changes, with no interaction with the public and occasional interaction with co-workers, but no tandem tasks, would be able to perform Myers's past jobs, and the VE responded negatively. *Id.* at 53-54. And, when the ALJ asked the VE whether that same hypothetical individual could perform other types of employment, the VE responded affirmatively, listing the following "medium" work examples: a poultry hanger, industrial cleaner, and kitchen helper. *Id.* at 54-55.

Next, the ALJ asked the VE to consider a hypothetical individual, with the same limitations set forth above, but this time adding the following additional limitations: "[l]ight work, occasional stairs, ladders, balance, stoop, kneel, crouch,

[and] crawl" as limitations. *Id.* at 55. The VE stated that this hypothetical individual could not perform Myers's past jobs, but that he or she could perform other jobs that consisted of "light" work, including a "[b]indery machine feeder off bearer," a bakery wrapper, and a small products assembler. *Id.*

Finally, the ALJ asked the VE to consider a hypothetical individual with all of the limitations described above, plus the following additional limitations: that the individual "cannot engage in sustained work activity on a regular, continuing basis for eight hours a day, five days a week, for a 40-hour workweek." *Id.* The VE responded that this hypothetical individual could not perform Myers's past jobs or any other type of job and that he or she would simply be "unemployable." *Id.* at 55-56.

Following this exchange between the VE and the ALJ, Myers's attorney then asked the VE whether a hypothetical individual of the same age and educational and work background as Myers could perform his past jobs if the hypothetical individual was limited to unskilled light duty work, where he or she could not be around unprotected heights, moving machinery or sharp objects, and could not have any interaction with the public or with co-workers. *Id.* at 56. The VE explained that this hypothetical person would not be able to perform Myers's past jobs. *Id.* The VE further explained that there would not be any transferability

of work skills from the past jobs to other work and that any skills required would be job specific. *Id.*

Myers's attorney then asked the VE to consider whether this same hypothetical individual, who also requires supervision more than two-thirds of the time to make sure that he or she is staying on task, could perform any unskilled, light duty work. *Id.* The VE explained that such an individual would not be able to do so and that he or she would be "unemployable." *Id.* 56-57.

**B. Relevant Medical Evidence.**

On March 28, 2013, Myers was examined by Dr. Thomas W. McLaughlin, M.D., a consultative examiner of Tri-State Occupational Medicine, Inc. (hereinafter, "Dr. McLaughlin"). *See doc. 8-7* at 52-64. In connection with this examination, Dr. McLaughlin provided a consultative examination report, titled "Internal Medicine Examination." *Id.* As evinced by this report, Myers complained to Dr. McLaughlin that he has a history of back pain and that his back pain consists of two different types: low back pain and mid to low back pain. *Id.* at 52. Myers explained that he could not identify a specific precipitating injury for either type of pain. *Id.* Myers also explained that his low back pain is constant and "achy" and that his mid to low back pain is intermittent, but graded as a 10/10 in pain. *Id.* Myers further explained that although his mid to low back pain only occurs intermittently, it can last for four to five days and incapacitate him "such that he

has difficulty getting out of bed, sleeping, etc." *Id*. at 52-53. In addition, Myers complained to Dr. McLaughlin about his "diffuse arthritic complaints[,] including pain in his hands, the right greater than the left[,] and also intermittent knee pain and shoulder pain." *Id*. at 53.

During his physical examination of Myers, Dr. McLaughlin found that Myers was able to walk "with a normal gait which [was] not unsteady, lurching or unpredictable." *Id*. at 54. He also found that Myers was able to stand unassisted, rise from a seated position, step up and down from the exam table without any assistance, and appeared comfortable in the seated and supine position. *Id*. In addition, Dr. McLaughlin found that Myers's hands revealed no evidence of "tenderness, redness, warmth, swelling, or nodules," but that there was "evidence of [a] previous left wrist fracture which was never treated" and evidence of previous carpal tunnel surgery. *Id*. at 56. Dr. McLaughlin also found that Myers's knees revealed "no tenderness, redness, warmth, swelling, effusion, laxity, crepitus, or clicks" and that his hips also revealed no tenderness to palpation. *Id*.

Regarding Myers's ability to perform work-related physical activities, Dr. McLaughlin opined that Myers would be limited to lifting and/or carrying 20 pounds frequently and 25 pounds occasionally. *Id*. at 63. Dr. McLaughlin noted no other limitations with respect to Myers's ability to stand, walk, sit, push, and

pull, or with respect to his postural activities, other physical functions, and environmental restrictions. *Id.* at 63-64.

Ultimately, Dr. McLaughlin diagnosed Myers with "Lumbosacral degenerative disease" and "Osteoarthritis diffuse, especially involving the right hip but also the knees, the hands, and the shoulders." *Id.* at 57. Dr. McLaughlin then referred Myers to Walnut Bottom Radiology for an x-ray. *Id.* at 65. The x-ray revealed degenerative changes in the lower facets of Myers's lumbar spine, especially on the right side. *Id.*

## C. The ALJ's Decision.

It is the responsibility of the ALJ, in the first instance, to determine whether a claimant, such as Myers, has met the statutory prerequisites for entitlement to benefits. In making this determination, the ALJ employs a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). This process requires the Commissioner to consider, in sequence, the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the severity of claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. § 404.1520(a)(4).

If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed any further. *See* 20 C.F.R. § 404.1520(a)(4). Additionally, between steps three and four of this process, the ALJ must determine the claimant's residual functional capacity ("RFC"), which is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, *1 (S.S.A. 1996). In making this assessment, the ALJ considers all of the claimant's impairments, including any medically determinable non-severe impairments. 20 C.F.R. § 404.1545 (a)(2).

In this case, the ALJ proceeded through all steps of the five-step sequential evaluation process. At step one, the ALJ determined that Myers did not engage in any substantial gainful activity between November 8, 2012, his disability onset date, and June 30, 2014, his date last insured. *Doc. 8-2* at 16. At step two, the ALJ determined that Myers had the following severe impairments: major depression (recurrent) and panic disorder with agoraphobia.[5] *Id.* At step three, the ALJ determined that Myers's impairments, whether considered alone or in combination,

---

[5] Although Myers was also diagnosed with having lumbosacral degenerative disease and osteoarthritis diffuse, the ALJ ultimately determined that these impairments were non-severe. *Id.*

did not meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 17.

Because the ALJ found that Myers's impairments did not meet such severity, the ALJ determined Myers's RFC before moving on to step four. *Id.* at 18; *see id.* at 15. Based on all of the evidence in the record, the ALJ found that Myers had the RFC to perform a full range of work at "all exertional levels" but with the following non-exertional limitations: "no commercial driving; work [must be] limited to simple, routine, repetitive tasks involving only simple work-related decisions with few, if any, work place changes; no interaction with the public; and occasional interaction with coworkers but no tandem tasks."[6] *Id.*

At step four, however, the ALJ determined that Myers did not have the RFC to perform the requirements of his past relevant work "because he is limited to simple work and his past work was semi-skilled." *Id.* at 22. And, finally, at step five of his analysis, the ALJ determined, based on the VE's testimony at the administrative hearing on October 9, 2014, that there were jobs in significant numbers in the national economy that Myers could perform, given his age, education, work experience, and RFC. *Id.* at 22-23.

---

[6] As illustrated below, the ALJ's RFC assessment is a significant point of contention on appeal.

## III. Standard of Review.

When reviewing the denial of disability benefits, the Court's review is limited to determining whether those findings are supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g) (sentence five); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp.

2d 623, 627 (M.D. Pa. 2003).

The question before the Court, therefore, is not whether the claimant is disabled, but whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

## IV. Discussion.

Myers asserts, among other things, that substantial evidence does not support the ALJ's determination that he has the RFC to perform a full range of work at all exertional levels. *Doc. 14* at 22-24. In support of this assertion, Myers alleges that, pursuant to Social Security Ruling 96-8p, the ALJ was required to consider both his severe and non-severe impairments in devising the RFC, but that the ALJ only considered his severe impairments. *Id.* at 23 (citing SSR 96-8p, 1996 WL 374184, *1 (S.S.A. 1996)). Myers also seemingly alleges that had the ALJ

complied with Social Security Ruling 96-8p and considered his non-severe impairments, as well as the underlying medical record to which those impairments are tethered, then the ALJ would have concluded that Myers's impairments physically limited him to "light work." *Doc. 14* at 24. Light work is defined by the Social Security Regulations, in material part, as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567.

Social Security Ruling 96-8p provides that a RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, *1 (S.S.A. 1996). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* In making this RFC assessment, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in [the Social Security Regulations]." *Id.* Those functions include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)[.]" 20 C.F.R. § 416.945(b). The underlying purpose of this assessment is to ensure that the ALJ does not overlook an important limitation and inaccurately classify the

individual's exertional capacity for work. *See* SSR 96-8p, 1996 WL 374184, at *4 ("Without a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may . . . overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do . . . ."). Only after the ALJ makes this assessment may the claimant's RFC be expressed in terms of the exertional levels of work—sedentary, light, medium, heavy, and very heavy. *Id.* at *1.

Here, the ALJ determined that Myers had the RFC to perform "a full range of work at all exertional levels[.]" *Doc. 8-2* at 18. In connection with this RFC, the ALJ ultimately concluded that Myers would be able to perform the requirements of unskilled, medium work, and thus, was not disabled. *Id.* at 23. Medium work, unlike light work, is defined by the Social Security Regulations, in material part, as follows: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

The ALJ erred, however, in reaching his conclusion because he did not address the concerns of Social Security Ruling 96-8p when he determined Myers's RFC. Specifically, he did not address Myers's ability to perform all of the physical functions of medium work, including Myers's ability to lift and carry. *See* SSR 96-8p, 1996 WL 374184, *1 (S.S.A. 1996) (citing 20 C.F.R. § 416.945(b)-(d)). The

ALJ also did not address whether Myers would be able to perform these physical functions on a regular and continuing basis. *See* SSR 96-8p, 1996 WL 374184, *7 (S.S.A. 1996).

In addition, the ALJ also erred because his decision is not supported by substantial evidence. In reaching his conclusion that Myers would be able to perform the requirements of unskilled, medium work, the ALJ failed to cite to a single medical opinion, which opined that Myers would be able to lift and/or carry 50 pounds occasionally and 25 pounds frequently, as required by medium work. And, in light of the ALJ's failure to do so, Myers points to a medical opinion in the record, which undermines the ALJ's conclusion that Myers would be able to perform these physical functions. In particular, Myers points to Dr. McLaughlin's consultative examination report, wherein he opines that the most Myers would be able to lift and/or carry is 25 pounds occasionally and 20 pounds frequently. *See doc. 8-7* at 63.

Although the Commissioner has argued—without citing to any portion of the ALJ's opinion or the underlying record—that "the ALJ appropriately accounted for Myers's non-severe physical impairments because the jobs identified by the [VE] are wholly consistent with the only physical limitations set forth in the record" (*doc. 16* at 16), we are unpersuaded. As stated by the ALJ in his decision, the VE identified jobs involving medium work. *Doc. 8-2* at 23. To be deemed

capable of performing medium work, a claimant must be able to lift and/or carry up to 50 pounds occasionally and up to 25 pounds frequently. As explained above, however, the evidence suggests that Myers cannot meet those physical functions. Thus, we reject the Commissioner's argument.

To conclude, we find that the ALJ erred in failing to address the concerns of Social Security Ruling 96-8p when he determined Myers's RFC. But, more importantly, we find that the ALJ erred because his decision is not supported by substantial evidence. Indeed, there is no medical evidence, or none to which we have been directed, that establishes Myers's ability to lift and/or carry up to 50 pounds occasionally and 25 pounds frequently. Thus, the ALJ's conclusion that Myers meets the requirements to perform medium work (*id.* at 23) is not only unsupported, but undermined by the evidence in the record. *See Espi Leon v. Colvin*, No. 3:15-CV-1375, 2016 WL 7366880, at *10 (M.D. Pa. Dec. 19, 2016) (concluding that "because there is not sufficient medical evidence to conclude that [the claimant] is capable of lifting up to twenty-five (25) pounds frequently, there is not sufficient evidence upon which to uphold the finding that [the claimant] is capable of performing medium work."). Consequently, we recommend vacating the Commissioner's final decision and remanding the case so that findings can be made regarding Myers's ability to perform the physical functions of medium work. As such, we decline to address Myers's remaining assertions.

## V. Recommendation.

Accordingly, for the foregoing reasons, **IT IS RECOMMENDED** that the Commissioner's decision denying Myers DIB be **VACATED** and the case be **REMANDED** for further proceedings.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this **31st** day of **August, 2017**.

_S/ Susan E. Schwab_
Susan E. Schwab
United States Chief Magistrate Judge